BANK OF MOBERLY, Appellant, v. ROSWALD MEALS, LOGAN MEALS, MAY MEALS, OTTO MEALS, J. MARVIN MEALS and ERNEST COTTINGHAM. 295 S. W. 73.

Division One, April 11, 1927.

**1. DEFERENCE TO CHANCELLOR: Evidence in Irreconcilable Conflict.** In an action at law, tried in the circuit court on the theory that it had by the answer been converted into a suit in equity, and tried on both sides as a suit in equity, this court on appeal, where the testimony on the precise issue is in irreconcilable conflict, will defer to the finding of the trial judge, who saw and heard the witnesses, or a majority of them, while they were testifying.

**2. NEGOTIABLE INSTRUMENT: Alteration: Material.** Under the Uniform Negotiable Instrument Law (Secs. 910, 911, R. S. 1919) an alteration to vitiate the instrument must be material. And a material altera-

tion is one which so changes the terms of the instrument as to give it a different legal effect from that which it originally had, and thus works some change in the rights, interest and obligations of the parties.

3. ——: ——: **Guarantor: Maker: Change in Number of Parties.** If the evidence merely discloses that the note was delivered to the payee by the parties who first signed and indorsed it, and thereafter another placed his name on it under the names of the makers and re-delivered it to the payee, the presumption arises that he signed it as guarantor, and a signing as guarantor does not effect an alteration, because the undertaking of a guarantor is collateral to and independent of that of the original parties. But where the evidence as a whole renders inadmissible the conclusion that such belated signer signed as a guarantor, but that he signed as an original promisor, after delivery, and did so at the instance of the payee, his signing effects a change in the number of the parties.

4. ——: ——: **Change in Number of Parties: Additional Makers: Injurious Effect.** Under the statute (Secs. 910, 911, R. S. 1919) any alteration of a negotiable instrument which changes the number or relation of the parties is a material alteration; and aside from the statute, the adding of an additional maker subsequently to its execution and delivery discharges the original parties when the change is made without their knowledge and consent. And it is unimportant whether the signature of an additional promisor is beneficial or injurious to the party whom it is sought to charge with its payment; the question is whether the contract in its altered condition is the contract into which such party entered, and if it is not the alteration is material.

5. ——: ——: ——: **Sureties.** The indorsers of a note, who indorse it in blank before delivery for the accommodation of the makers and waive protest, are sureties for the makers or such of them as are principal debtors, at least while the note is still in the hands of the payee; and a surety has a right to stand on the very terms of his contract, strictly construed, and any variation in its terms without his consent is fatal and discharges him.

6. ——: ——: ——: ——: **Additional Joint Maker: Discharge.** The signing of a note by one who signs as a joint maker after its delivery to the payee is a material alteration, and sureties, if the alteration is made without their knowledge or consent, are thereby discharged from their obligations to pay it.

7. ——: ——: **Note for Partnership Debt: Signed by Some Partners.** The signing by a third partner as a joint maker of a note, given for an existing partnership debt, and after it has been signed by two of the partners and delivered to the payee, is a change in the number or relation of the parties, and discharges sureties who did not consent to or have knowledge of such alteration obtained by the payee. The third partner was liable for the debt, but the sureties were not; and the mere fact that the third partner continued to be liable for the debt after the note had been executed by the two partners and the two sureties, did not make him a party to the note.

8. ——: **Party Making Alteration: Consideration.** The signing by one as a joint maker and its re-delivery to the payee of a note after its execution and delivery by others, is in effect the execution of a new note; and if it is given for an antedecedent or pre-existing debt, it is supported by a sufficient consideration, and the signer, having himself made the alteration, is liable for its payment.

9. ——: *Accommodation* Maker: Consideration. It is not necessary that a consideration should have moved an accommodation maker to sign the note. The consideration which supports the promise of an accommodation

maker is that parted with by the payee and received by the person accomodated.

**10. ————: Alteration: Defaulting Maker.** In a suit on a note, which has been materially altered, judgment should go against a maker who files no answer.

Corpus Juris-Cyc. References: Alteration of Instruments, 2 C. J., Section 2, p. 1173, n. 8; Section 33, p. 1193, n. 73; Section 82, p. 1218, n. 92; Section 83, p. 1219, n. 1; Section 210, p. 1287, n. 3. Appeal and Error, 3 C. J., Section 620, p. 724, n. 78; 4 C. J., Section 2870, p. 900, n. 98. Bills and Notes, 8 C. J., Section 351, p. 215, n. 36; Section 403, p. 257, n. 1. Principal and Surety, 32 Cyc., p. 73, n. 22; p. 185, n. 39 New.

Appeal from Audrain Circuit Court.—*Hon. Ernest S. Gantt*, Judge.

Affirmed as to Sureties; Reversed and Remanded (*with directions*) as to other defendants.

*Willard P. Cave, M. J. Lilly, W. W. Fry, Jr.*, and *Perry S. Rader* for appellant.

(1) The great weight of evidence is that the four makers and two indorsers of the note all signed it before its delivery. Plaintiff's evidence is clear, positive, direct and consistent that the six of them signed the note at the same place, and at the same time, one right after the other, in the order in which their names appear on the note. The evidence for the defendants that Otto Meals did not sign it at that time, but signed it' six days later, is contradictory, unreasonable and inconsistent with the other established facts of the case. (2) The burden was upon defendants to show by the greater weight of the credible evidence that Otto Meals signed the note as a maker after its indorsement and delivery. Secs. 798, 811, 2160, R. S. 1919; Stillwell v. Patton, 108 Mo. 363; Kilpatrick v. Wiley, 197 Mo. 164; Paramore v. Lindsey, 63 Mo. 66; La Belle Savings Bank v. Taylor, 69 Mo. App. 105; Roettger v. Rothermel, 251 S. W. 428; First Natl. Bank v. Ford, 216 Pac. (Wyo.) 692; Harris v. Bank, 22 Fla. 512; Kalteyer v. Mitchell, 102 Tex. 392; Barcliff v. Treece, 77 Ala. 532; Graham v. Rush, 73 Iowa, 451; Insurance Co. v. Brim, 111 Ind. 283; Conable v. Keeney, 16 N. Y. Supp. 719; Pullen v. Hutchinson, 25 Me. 253; Davis v. Jenney, 1 Metc. (42 Mass.) 221; Cosgrove v. Fanebust, 10 S. W. 214; Crews v. Farmers Bank, 31 Gratt. (Va.) 353; Sturm v. Baker, 150 U. S. 318, 340; Towles v. Tanner, 21 App. (D. C.) 542, 547; Teske v. Baumgart, 99 Nebr. 479; Cavitt v. Robertson, 42 Okla. 619. (3) In law there was no material alteration even if it were a fact that Otto Meals was permitted by the bank to sign the note as a maker six days after its indorsement by the two sureties. The evidence conclusively shows that the note was given for an existing partnership indebtedness, and that it was signed by at least two

of the partners as makers before it was indorsed by either of the two indorsers, and even though Otto Meals, the third member of the partnership, signed it after its delivery his signature did not work a change in the number or relation of the parties, or increase or decrease the legal obligations of the indorsers or of the other makers or of himself. It became a binding and legal obligation for the partnership debt as soon as Roswald Meals and Logan Meals signed it, and the signature of Otto Meals, whether he signed it at the same time they did or subsequently, was not a change or addition which altered the effect of the instrument in any respect. Sec. 911, R. S. 1919; Meador v. Malcolm, 75 Mo. 550; Ault v. Bradley, 191 Mo. 709; Dreyfus & Co. v. Union Natl. Bank, 164 Ill. 83; 1 Greenleaf on Evidence, sec. 567; Smith v. Crooker, 5 Mass. 537; Taylor v. Taylor, 12 Lea (Tenn.) 714; Mace v. Heath, 30 Nebr. 620; Howell v. Adams, 68 N. Y. 314; Pahlman v. Taylor, 75 Ill. 629; Continental Bank & Trust Co. v. Sacks, 152 La. 103; Ensign v. Fogg, 177 Mich. 317; Arnold, Barbour & Hartshorn v. Jones, 2 R. I. 345; Blair v. Bank, 11 Hump. (30 Tenn.) 84. (4) A change in the number of signers is not necessarily a change in "the number of the parties." If the name of Otto Meals was signed to the note as maker six days after it was signed by the other three makers and indorsed by the two indorsers, that was not a change in the number of the parties. He was already a party. The law had placed his name on the note. The law implied that, being a member of the firm of Logan Meals & Sons, and the note being for a partnership indebtedness, and two of the partners having signed it before its indorsement, Otto was just as much a party to the note without his name as with it; and his subsequent signature was not a change in the parties, or a change in the relation of the parties, or a change or addition which altered the effect of the instrument in any respect. He, and all the makers and both the indorsers remained liable on the note in exactly the same way and to the same extent after he added his signature as they were before he added it. See, exactly in point Dreyfus & Co. v. Union Natl. Bank, 164 Ill. 83. (5) Plaintiff was entitled to a judgment against Otto Meals. Even if it is affirmed as to all the other defendants is cannot be affirmed as to him. The statute relating to material alterations does not avoid the note as to him, since he made the alteration. Sec. 910, R. S. 1919; Handsaker v. Pedersen, 71 Wash. 218.

*A. R. Hammett* and *Rodgers & Buffington* for respondents.

(1) Plaintiff's witnesses, the three bank officials, testified that Otto Meals was in the bank on the afternoon of April 30, 1921, so as to make it possible that he signed the note then and there, whereas

defendants witnesses, Otto Meals, Logan Meals, May Meals and Sarah Cottingham, four in number, and manifestly as equally credible as plaintiff's three witnesses, and with no greater if as much interest to subserve in the case as the bank officers, showed that Otto Meals was on the farm, six miles from Moberly during all of said day and accordingly was not in the bank and couldn't have signed the note on the afternoon of said April 30th. In addition, the defendant endorsers both testified that Otto Meals' name was not on the note when they endorsed it. (2) Appellant urges that it makes no difference from a legal standpoint whether or not Otto Meals signed the note because he was a member of the so-called firm of Logan Meals & Sons. The evidence in the case conclusively shows that all of the loans made by the bank were transactions between the bank and Roswald Meals. Appellant urges three decisions of this court as substantiating its view that it didn't make any difference when Otto Meals signed the note or whether he signed at all. Neither of the three cases are in point. In the case of Leabo v. Goode the suit was not upon the note but was upon the original debt of the partnership which had been paid by one of the sureties. In the case of Meader v. Malcolm the suit was upon a note signed in the partnership name. In the case of Aull v. Bradley the suit was upon a claim in the probate court evidenced in writing, to-wit, by notes, and the only issue involved in the case was the character of the original debt so as to determine whether it should be charged against the partnership or the individual or both. We will concede for the sake of argument in the case at bar that the character of the original debt was a partnership liability, yet the plaintiff saw fit to take a note which upon its face shows only individual liability, and choose to bring suit on this note. Under the same and identical circumstances this court has held in Farmers' Bank of Mo. v. Bayless, 35 Mo. 439, that where one or more of several partners execute a note in their own name for money borrowed, no action on the note can be maintained against a partner not signing although the money may have been borrowed for the firm and applied to partnership purposes. Hence this court's decision aforesaid puts at rest appellant's contention that Otto Meals would have been liable on the note as of April 30th even though he didn't sign it then. (3) Section 911, R. S. 1919, says in clear words that any alteration which changes the number or relation of the parties is a material alteration. Manifestly the addition of Otto Meals's name increases the number of the parties, furthermore it changes the liability of the endorsers in that they are made sureties of Otto Meals. (4) "The signing of a name as a maker to a note is an alteration that will discharge all the original parties not consenting thereto." Allen v. Dorman, 57 Mo. App. 291; Lant v. Silver, 5 Mo. App. 186; Farmers Bank v. Meyers, 50 Mo. App. 157.

RAGLAND, J.—This case comes to the writer for opinion on re-assignment. It is a suit on a promissory note. The note was dated April 30, 1921. According to its purport, the defendants, Roswald Meals, Logan Meals, May Meals and Otto Meals, as makers, promised to pay to the order of plaintiff bank, one year after date, $15,200, with six per cent per annum interest thereon from date, payable annually. Prior to its delivery it was endorsed in blank by defendants, J. Marvin Meals and Ernest Cottingham, for the accommodation of the makers, the endorsers waiving notice of demand and protest.

The petition is in the usual form. Defendant Roswald Meals by his answer pleads release from liability by reason of a discharge in bankruptcy. Defendant Otto Meals by verified answer denies that *on the 30th day of April, 1921,* he made and executed the note sued on; he further alleges a total failure of consideration. Defendant May Meals in her separate answer alleges in general terms a failure of consideration. Defendants J. Marvin Meals and Ernest Cotting-ham in a joint and separate answer set up two defenses: (1) That defendant Otto Meals signed the note sued on long after its execution and delivery by the other parties thereto, by reason of which there has been a material alteration of the note; and (2) that they were compelled to endorse the note through duress, in that the offi-cers of plaintiff bank were threatening unless they did so to institute a criminal prosecution against Roswald Meals, their near relative. Defendant Logan Meals has filed no answer. The new matter in all of the answers, except that of defendant Roswald Meals, is put in issue by replies.

No part of the answer of the defendants, J. Marvin Meals and Ernest Cottingham, purports on its face to be a cross-petition. The matters relating to material alteration and duress are apparently pleaded as defenses; yet the answer concludes with a prayer that "the decree of the chancellor be that the note in question be delivered up, declared to be null and void and cancelled, and for such other and further relief," etc. The cause was tried in the circuit court as a suit in equity; the court found generally for the defendants on all issues, and entered a decree in conformity with the prayer just quoted. As the cause was tried below by both parties on the theory that it had been converted by answer into a suit in equity, it will be disposed of on that theory here.

Such of the uncontroverted facts as will show in a general way the setting of the case will first be noted. Defendants Logan Meals and May Meals are husband and wife; defendants Roswald and Otto are their sons. At the time of the occurrences herein referred to Logan and May Meals resided on his farm of one hundred and twenty acres located in Randolph County, about six miles from Moberly. Roswald and Otto owned eighty acres of land adjoining, or near, that of their

father. The father and the two sons were engaged in farming and in raising and buying and selling livestock. They operated as partners under the firm name of Logan Meals & Sons. Otto lived with his parents; Roswald was employed at the Kansas City Stock Yards as auctioneer, but he customarily spent the latter part of each week at his father's home.

In April, 1917, Logan Meals & Sons, through Roswald, opened an account with plaintiff bank, and thereafter each member of the co-partnership as occasion offered drew checks against the firm's account. At about the same time that the account was opened Logan Meals and his two sons borrowed of plaintiff $6,600 and gave as security a deed of trust on the two hundred acres of land heretofore referred to; the co-partnership also borrowed from the bank $1900 on their unsecured note. Thereafter the firm's unsecured indebtedness to the bank was increased from time to time by additional loans until on December 24, 1920, it had reached the sum of $21,000. On that date Roswald Meals applied for a further loan of $6,165.05 and was told by the bank's officers that no further advances would be made on his firm's unsecured paper. Thereupon Roswald represented that the co-partnership owned, and then had out on the farms belonging to his father and to himself and Otto, livestock of the value of about $17,000. It was then arranged that the bank would make the additional loan and that Logan Meals and his two sons would execute two new notes; one for $12,000 to be secured by a second deed of trust on the two hundred acres of land, and one for $15,975.40 to be secured by chattel mortgage on the livestock, thereby securing all of the then unsecured indebtedness of the firm to the bank, as well as the loan applied for. This arrangement was carried into execution. The $12,000 note and deed of trust were signed by Logan Meals and his wife, May, and by each of his two sons. The $15,976.40 note and chattel mortgage were signed individually by the father and each of the sons. Logan and Otto each denied that he signed these two documents, but according to the great weight of evidence both signed them.

On April 29, 1921, in response to the insistence of the bank's officials that such of the livestock described in the chattel mortgage as was in a marketable condition be sold and the proceeds applied on the mortgage indebtedness, Roswald Meals confessed that Logan Meals & Sons did not have, either then or at the time the mortgage was given, any such livestock as was described therein. He stated, however, that he could furnish personal security that would be satisfactory to the bank. In that connection he named J. Marvin Meals and Ernest Cottingham and two others as persons whom he might be able to procure as sureties on a new note. He was told that any two of the four named would be acceptable, but that the matter must

be fixed up at once.  He immediately went to see first Meals, a brother of his father, and then Cottingham, a brother of his mother. Both were farmers and at that time were living near Moberly.  He explained to each his dilemma, and each promised to come to town the next day and see. what could be done to extricate him from his embarrassment.  The next day, at about 2:30 o'clock in the afternoon, Roswald Meals, Logan Meals and May Meals appeared at plaintiff's banking rooms and signed as makers, in the order just named, the note in suit.  (Whether Otto Meals signed the note on that day will be considered in subsequent paragraphs.)  After the three had signed and they went out on the street to see if they could find J. Marvin Meals and Cottingham.  Presently the latter made their appearance and inumerable conferences then followed, between them and the members of the Meals family who were present, and between all of them (through intermediaries) and the officials of the bank.  Finally about 4:30 P. M., long after the bank's regular closing hour, J. Marvin Meals and Cottingham endorsed the note and it was delivered to the bank.

According to the testimony of Logan Meals and May Meals, Otto did not go to Moberly with them the day they signed the note.  They and Roswald ate an early dinner and then drove to Moberly in an automobile, leaving Otto at home at work harrowing in oats.  When they returned about five o'clock or a little later, they summoned him from the field, where he was still at work, to drive Roswald to Moberly to enable the latter to take a six o'clock train to Kansas City.

Mrs. Sarah Cottingham, Mrs. Meals's aged mother who was then staying at the home of her daughter, testified that Otto was at work all day harrowing in oats in a field in sight of the house; that he did not leave the place until late in the evening when he left with Roswald to take him to a train; and that he was then gone but a short time.

Otto Meals testified that on April 30, 1921, he was at work all day on the farm harrowing in oats; that when he came in at noon he inquired of his grandmother where the other members of the family were, and was told that they had gone to Moberly; that he returned to the field and continued to work until about five o'clock when he was called to the house to take Roswald to the train; that he drove Roswald to Moberly and without getting out of the automobile immediately returned home; that on the following Thursday Roswald on his return from Kansas City told him about the note and the bank's direction that he come in and sign it; and that on the next day he and Roswald drove to Moberly and he went into the bank and placed his signature on the note.

J. Marvin Meals and Ernest Cottingham each testified that he did not see Otto Meals in Moberly on the day on which the note was

executed, and that his signature was not on the note at the time they endorsed it and at the time it was delivered to the bank.

Plaintiff called three of its officers as witnesses: Frank Harvey, cashier; John S. Lamb, vice-president; and John E. Lynch, president. Mr. Lynch at the time of the occurrences giving rise to this controversy was United States Marshal for the Eastern District of Missouri with headquarters at St. Louis. He customarily spent Saturday of each week at the bank in Moberly, where he acted in an advisory capacity. (April 30, 1921, fell on Saturday), Mr. Lamb was in charge of and handling for the bank the transaction in question. He testified positively that Otto Meals was present in the bank when his father, mother and brother signed the note, and that he himself signed it at that very time and place, being the last to sign. Mr. Harvey did not see Otto Meals sign the note, but he was quite clear in his testimony that Otto was in and around the bank at the time the others signed. Mr. Lynch's testimony was to the same effect.

It is conceded by the evidence on both sides that the note in suit was completed and delivered on April 30, 1921. There is no suggestion that there was any understanding that it was not to be regarded as delivered until signed by Otto Meals or that Otto was to sign it. Whether he signed it on that day was the precise issue to which both parties directed their proof. With respect to that issue six witnesses were called by defendants and three by plaintiff, as heretofore indicated. Two of defendants' witnesses, Mrs. Cottingham and Otto Meals, testified by deposition. All of the others were present at the trial. Aside from motives of self-interest, which must always be taken into consideration in weighing human testimony, the record discloses nothing that affects adversely the credibility of any of these witnesses. The testimony of none of them, whether considered alone or in connection with all the facts and circumstances in evidence, suggests any inherent improbability of its truthfulness. Yet their testimony taken as a whole presents an irreconcilable conflict. Under such circumstances we feel impelled to defer to the finding of the chancellor who saw and heard the witnesses, or a majority of them, while they were on the stand giving their testimony. He found that Otto Meals did not sign the note until after its delivery to the bank, and that brings us to the consideration of the first legal question presented by the record.

It was long held in this State that any alteration of a promissory note by a party thereto without the knowledge of the other parties, however immaterial, would invalidate it as against them. [First National Bank v. Fricke, 75 Mo. 178.] But under the Uniform Negotiable Instrument Law (see Secs. 910 and 911, R. S. 1919) and under the modern doctrine generally (1 R. C. L. 967), an alteration

to vitiate an instrument must be material. On the record here we have to determine, first, whether there was an alteration of the instrument sued on, and second, whether the alteration, if there was one, was material.

If the evidence merely disclosed that the note had been delivered to the bank by the parties who first signed and endorsed it and thereafter Otto Meals placed his signature on it and redelivered it to the bank, the presumption would arise that he signed as guarantor. [Stagg v. Linnenfelser, 59 Mo. 336, 342-3; Tenney v. Prince, 4 Pick. 385.] And if he had signed as guarantor such signing would not have affected an alteration of the note because his undertaking would have been collateral to and independent of that of the original parties. [Stagg v. Linnenfelser, supra; Burnham v. Gosnell, 47 Mo. App. 637; Adams v. Huggins, 73 Mo. App. 140; Corbyn v. Brokmeyer, 84 Mo. App. 649.] The evidence as a whole, however, renders inadmissible the view that Otto Meals signed as guarantor. In the first place his relationship to the parties and to the transaction and his financial condition, all exclude the idea that that was the character of his engagement. In the second place he participated in the original consideration for which the note was given, namely: money lent to the co-partnership of which he was a member. Again, he was a party to the note and chattel mortgage surrendered by the bank on the execution of the note in suit, and with respect to such note and mortgage he was a principal debtor. There can be no question, we think, but that he intended to sign, and did sign, the note involved in this proceeding as an original promisor, and that he did so at the instance of the payee bank. As a consequence his signing effected a change in the number of the parties to the note.

A material alteration is one which so changes the terms of the instrument as to give it a different legal effect from that which it originally had, and thus works some change in the rights, interest or obligations of the parties. "It is equally unimportant whether the alteration was beneficial or injurious to the party whom it is sought to charge on the instrument. The question is not whether such party has been, or could be, injuriously affected, but whether or not his rights have been materially affected—whether the contract in its altered condition is the contract into which he entered. That is material which might become material, and any alteration which may in any event alter the rights, duties, or obligations of the person sought to be charged is material in the legal sense." [1 R. C. L. 968.] Under Section 911, Revised Statutes 1919, "any alteration which changes . . . (4) the number or relation of the parties . . . is a material alteration." Independent of the statute, according to the greater weight of authority, the adding of an additional party to a negotiable instrument subsequent to its execu-

tion and delivery discharges the original parties when such change is made without their knowledge or consent. [Bank of Commerce v. Webster, 70 Okla. 73; Taylor v. Johnson, 17 Ga. 521; Nicholson v. Combs, 90 Ind. 515; Soaps v. Eichberg, 42 Ill. App. 375; McCaughey v. Smith, 27 N. Y. 39; Wallace v. Jewel, 21 Ohio St. 163; Ford v. Bank (Tex. Civ. App.), 34 S. W. 684; Brown v. Johnson Bros., 127 Ala. 292.]

"The reason why the addition of a name to a note, as a joint maker, after its issuance, materially alters it, is because it changes the number of parties and their relative rights; it changes the rate of contribution; and it changes the character and description of the instrument. The original obligor may thereby be subjected to a suit in a county other than that of his residence, and suffer inconvenience and injury, as was done in this very case." [Ford v. Bank, supra.]

Defendants J. Marvin Meals and Cottingham, having endorsed the note in blank for the accommodation of the makers before delivery and waived notice of demand and protest, were, at least while the note was still in the hands of the payee, neither more nor less than sureties for the makers or such of them as were the principal debtors. And sureties have a right to stand on the very terms of their obligations; having consented to be bound to a certain extent only, their liability must be found within the terms of that consent, strictly construed. In Taylor v. Johnson, supra, it was said:

"The rule of law is not disputed, that the liability of a surety cannot be extended beyond the actual terms of his engagement; and that his liability will be extinguished by any act or omission which alters the terms of the contract, unless it be with his consent. And for myself, I am satisfied that the uniform doctrine of the books, supported by numerous decisions, is, that it matters not that the alteration be for the benefit of the surety, because he has a right to stand upon the very terms of his agreement. And it is no answer to a surety to say that the alteration is not material. He has a right to determine for himself whether he will or will not consent to the alteration—whether *he thinks* it material or immaterial. No power of man can alter his engagement, and his liability be retained. He has a right to stand upon the very terms of his contract, and without his consent any variation of it is fatal."

In view of the statute, as well as of the authorities to which reference has been made, it must be held that the signing of the note in question by Otto Meals as maker after its delivery to the Bank was a material alteration thereof, and that as such alteration was made without the knowledge or consent of defendants J. Marvin Meals and Cottingham their obligations were thereby discharged. This conclusion renders it unnecessary to consider the further defense of duress pleaded by these two defendants.

It is argued by appellant that, as the note was given for an existing partnership indebtedness and had been signed by two of his partners, its signing after delivery by the third partner did not work a change in the number or relationship of the parties. But it is obvious that the parties who were liable on the original indebtedness and the parties to the note were not the same. There was no necessary relationship between the two. Otto Meals was liable for the original debt, but J. Marvin Meals and Ernest Cottingham were not. The latter were obligated on the note, but Otto was not prior to his signing it. The mere fact that Otto continued to be liable for the partnership debt after a note therefor had been executed by other parties did not make him a party to the note. This seems too plain for discussion.

The judgment of the circuit court was erroneous as to the defendants Otto Meals, May Meals and Logan Meals. When Otto Meals signed and redelivered the note to the bank that was, in effect, the execution of a new note (Rhoades v. Leach, 93 Iowa, 337); and it was supported by a sufficient consideration, in that it was given for an antecedent or pre-existing debt. [Sec. 812, R. S. 1919.] May Meals was an accommodation maker, but it was not necessary that any consideration should have moved to her. The consideration which supports the promise of an accommodation maker is that parted with by the person taking the note and received by the person accommodated. [Marling v. Jones, 138 Wis. 82.] This defendant did not plead alteration of the note in avoidance of her obligation; presumably it was done with her knowledge and consent. Logan Meals filed no answer and judgment should have gone against him of course.

The judgment of the circuit court is reversed and the cause remanded with directions to that court to enter judgment in favor of plaintiff, according to the prayer of its petition, as against the defendants Logan Meals, May Meals and Otto Meals; but for the remaining defendants.

The costs of this appeal will be taxed against the respondents, Logan Meals, May Meals and Otto Meals.

All concur, except *Gantt, J.,* not sitting.