ANNA BELLE K. PAXON, RESPONDENT, v. KREGEL CASKET COMPANY, A. CORPORATION, AND WILLIAM B. RHODES, APPELLANTS.*

Springfield Court of Appeals. September 28, 1928.

152

*Corpus Juris-Cyc References: Agency, 2CJ, section 34, p. 439, n. 4; Alteration of Instruments, 2CJ, section 82, p. 1218, n. 92, 93; section 83, p. 1219, n. 1; Appeal and Error, 4CJ section 2868, p. 898, n. 86; section 2994, p. 1010, n. 7; Bills and Notes, 8CJ, section 355, p. 220, n. 92; section 1216, p. 931, n. 70; section 1360, p. 1051, n. 39; section 1361, p. 1053; n. 55; Contracts, 13CJ, section 616, p. 597, n. 80.

*Allen & Allen* for appellants.

*Mann & Mann* for respondent.

BRADLEY, J.—This is an action to enjoin the negotiation of and to cancel a promissory note. Decree went for plaintiff as prayed, and defendants appealed. Kregel Casket Company is in fact the only defendant concerned and hereinafter where we use the term defendant we have reference to the casket company.

The note in question was payable to defendant and dated January 4, 1927, is in the principal sum of $4625.29, due on demand and draws interest at six per cent from date, and purports to be signed by plaintiff and R. E. Snow. The substance of plaintiff's petition is that she did not sign the note, but that if she did sign it, she did not know it and she did not intend to sign it, and that her signature was procured by false and fraudulent representations. Also an alleged material alteration is pleaded. The answer of defendant Rhodes is to the effect that he has no interest in the note and no authority to negotiate it or to do anything concerning it.

The answer of defendant casket company denies that the signature of plaintiff was procured by false or fraudulent representation; that the note was duly executed by plaintiff and Snow on the date it bears and was on said date delivered to it; that the consideration was: That at the time of the execution of the note plaintiff held the majority of the stock in the Paxon Undertaking Company, a corporation, and was an officer of said undertaking company; that, at the time, Snow was a stockholder and manager of said undertaking company; that the undertaking company was at the time, indebted to defendant for merchandise in the sum of $4625.29; that a large amount of this indebtedness was long past due and immediate payment was being demanded; that plaintiff was president of the undertaking company and drew a large salary as such and desired to maintain the credit and financial standing of the undertaking company; that in consideration of an agreement that defendant would extend further time on the account and extend further credit to the undertaking company, plaintiff and Snow executed the note as security to the account of the undertaking company.

Error is assigned on the sufficiency of the evidence to support the decree rendered and on the exclusion of certain evidence.

The Paxon Undertaking Company for many years prior to the execution of the note had been operating in Springfield, Missouri, and continued for a short time thereafter, when it went into receivership and ceased to operate. Prior to the death of Ely Paxon on March 3, 1926, the undertaking company was under his management. Plaintiff is the widow of Ely Paxon who owned at the time of his death the majority of the stock of the undertaking company which stock, on Paxon's death, went to plaintiff. At the time of Paxon's death the undertaking company was somewhat involved and on January 1, 1927, it owed about $9000 including the $4625.29, account of defendant, for which the note is alleged to have been

given to secure. At the time of the death of Ely Paxon he owed the undertaking company about $7000. Plaintiff received in insurance on the life of her husband about $12,000, and on agreement with the undertaking company she paid to it, out of her insurance, $5000 in full settlement of the $7000 owed the undertaking company by Ely Paxon, her husband. The $5000 was paid out by the undertaking company on its obligations, $3000 of which was paid defendant. Plaintiff also paid, out of her insurance, another item of $1200 for wages due an employee of the undertaking company, and paid off a mortgage on her home. After making these payments plaintiff had nothing of consequence except her home and her stock in the undertaking company which stock was, or turned out to be, worthless. Such was plaintiff's financial situation at the time it is alleged she signed the note in question.

Plaintiff is seventy-six years old and is, and was at the time it is alleged that she signed the note, suffering from cataracts in both eyes and is practically blind. Her physician testified that she was unable, because of her blindness, to read to any extent of consequence.

After her husband's death plaintiff was made president of the undertaking company and drew $200 per month salary as long as there were any funds to pay her. Although plaintiff was president the management of the undertaking company was left almost entirely to Snow. The note was shown to plaintiff at the trial and she admitted that as far as she could see the signature on the note resembled her signature. George D. McDaniel, a banker, and acquainted with plaintiff's signature, testified that in his opinion the signature on the note was the genuine signature of plaintiff. But plaintiff testified that no one ever asked her to sign this note or any other note payable to defendant, and that if she signed the note she did so without knowing what she was signing. Plaintiff further testified that in January, 1927, she knew that the undertaking company was in bad financial condition, but did not know the extent; that she did not know "how much money we did owe or who all the creditors were. Didn't begin to know; couldn't find out."

R. E. Snow, whose name was signed to the note, and who was a witness for defendant, testified that defendant was getting much concerned about its account, and agreed "to take a note and hold it against her (plaintiff's) estate and not collect it during her lifetime and the company could go ahead and pay it off little by little;" that he talked with plaintiff two or three times about the note and the account: that the note was prepared by defendant Rhodes and handed to him; that he thereupon took the note to plaintiff's home and told her that defendant would hold it and "wouldn't press us on that account and we would take care of it as we could, and at her death they would collect it;" that defendant had agreed with him to do that. Snow further testified that he told plaintiff what defend-

ant had agreed as to extending future credit and that "our credit would be all right;" and that plaintiff signed the note in his presence. Snow testified in effect that he explained the note to plaintiff, but did not read it all to her; that he told plaintiff that if she signed the note "she would never have to pay it in her lifetime."

Defendant Rhodes testified that he was the traveling salesman of defendant; that prior to the date of the note he had discussed the account with Snow; that on the afternoon of the day the note is dated he went into the undertaking company's place of business and told Snow that he, witness, had to go to St. Louis and that he had to make some report as to the account and that Snow said for him to come down after supper and "I will get the note signed; she is ready to sign it;" that he went down as suggested and that Snow "went over with it and came back in about forty-five minutes and handed me the note and says, 'What are you going to do with it?' and I says, 'Like what we said; we will hold it until her death.' That is what I told him to tell her, and he handed me the note and I said, 'Put your name on it to make a couple of names,' and he did and I took the note and sold them a bill of goods."

Plaintiff was recalled and testified that she had no conversation with Snow about the note and that Snow was not at her house on January 4, 1927, the date of the note.

The trial of this cause was commenced June 4th, and at the close of that day it was continued to June 11th for argument. On June 11th plaintiff with leave amended her petition by adding the following: "Plaintiff further alleges that after her signature to said alleged promissory note was procured, if in fact she did sign the same, the same was after the delivery thereof, and without her consent, knowledge or permission, signed by one R. E. Snow, and that his signature so placed upon said note, without her consent, knowledge or permission, constituted a material alteration thereof, in that it changed the number and relations of the parties thereto, and thereby rendered the same void as to this plaintiff."

Following the amendment defendant was granted leave to offer additional evidence and the cause was continued to July 25th. On July 25th defendant Rhodes was recalled and testified that the note was signed by Snow before it was delivered to him, Rhodes. Snow gave additional evidence by deposition. In the deposition Snow repeated a good deal of his former evidence, but testified that on an occasion prior to the date of the note he had talked with plaintiff about giving the note and had explained to her that the note was to be signed by him also. In other words, Snow in his deposition testified to the effect that when plaintiff signed the note she knew that he was also going to sign it. Snow further testified in the deposition that when he returned from plaintiff's home with the note he gave

the note to Rhodes and that Rhodes "laid it down on my desk and said, 'Well put your name on there'" and that he then signed it.

Plaintiff presents four propositions and contends that either, if established, will support the decree rendered. These propositions are: (1) That there was no consideration to support the note; (2) that she did not sign the note; (3) that if she did sign the note her signature was procured by false and fraudulent representations and that she did not know what she was signing; and (4) that if it be found that there was sufficient consideration to support the note; that she signed the note and that she was not induced to sign by false and fraudulent representations, still she is not liable because there was, after she signed and without her knowledge and consent, a material alteration.

Plaintiff was in no way personally liable on the account of the undertaking company, but it is contended that by reason of the note defendant forbore to press its account demand against the undertaking company and thereby changed its position to its detriment, and that such constitutes a valid consideration for the note although no benefit resulted to plaintiff. If the facts were as predicated then the contention is correct. [Bell v. Simpson, 75 Mo. 485; Citizens Bank v. Oaks, 184 Mo. App. 598, 170 S. W. 679.] However, the facts do not support the predicate. When defendant took the note it could have then sued on its account. The note was due on demand and had defendant so desired it could have immediately after the execution of the note demanded payment and sued thereon if the account was not paid. Therefore, defendant, since the note was due on demand, cannot stand on the proposition that it, prior to the execution of the note, agreed not to attempt to collect it during the life of plaintiff. That all matters concerning the note, prior to its execution, were merged therein will be conceded. If after the execution of the note, facts arose which might estop defendant from proceeding to collect thereon after demand, certainly there is nothing remotely possible that could protect plaintiff from an innocent holder should defendant transfer the note to such holder. And there is not in this record any suggestion of any kind or character as to what facts may have arisen or might arise to estop defendant, should it elect to demand payment on the note and immediately thereafter proceed to enforce payment. There is no reasonable conclusion except that there was in fact no extension or forbearance that was binding on defendant. Hence there is no escape as we see it from the conclusion that there was no consideration to support the note in question. There was no benefit to plaintiff and no detriment to defendant.

Does the evidence justify the finding that plaintiff signed the note? We are of the opinion that it does. There was no finding of facts by the court below, hence we do not know what opinion the learned chancellor had on this question. But plaintiff at no time testified that she

did not sign the note. She conceded that the signature on the note resembled her signature. Mr. McDaniel, plaintiff's banker, and who was familiar with her signature, testified that in his opinion the signature on the note was plaintiff's signature. There was nothing to the contrary, except that plaintiff says that if she signed the note she did so without knowing what she was signing. The rule, of course, is, in an equity case, that deference is given to the finding of the trial court on questions of fact. [Carpenter v. Kendrick, 299 Mo. 95, l. c. 113, 252 S. W. 646.] As stated we do not know what opinion the chancellor had on the question of plaintiff's signature, but it is our finding that the signature in question is plaintiff's.

Was plaintiff's signature procured by false and fraudulent representations? And did plaintiff sign without knowing what she was signing? Before proceeding to dispose of these questions another question must be first answered. It is contended by defendant that Snow was plaintiff's agent and not defendant's in the matter of procuring the note and that, whatever representations he may have made, defendant is not bound thereby. If Snow was not the agent of defendant in procuring the note, then defendant is not bound by the representations made. But the record does not support the contention that Snow was plaintiff's agent. Rhodes was admittedly defendant's agent clothed with full authority, so it appears, to take such action regarding defendant's account as he desired. Rhodes took up the matter of the account with Snow and the plain inference is that the note was procured at the instigation of Rhodes. We do not deem it necessary to further state the facts. We are clear that Snow was acting for defendant in procuring the note. [Gottschalk v. Kircher, 109 Mo. 170, l. c. 182, 17 S. W. 905.]

We will next dispose of the question as to whether plaintiff knew what she was signing. According to Snow she did, but according to plaintiff she did not. The burden was on plaintiff. There was some evidence tending to impeach Snow regarding what he said as to having read the note to plaintiff. When Snow was first on the stand he was asked by counsel for plaintiff if he did not state in the presence of J. L. Carroll and Dr. Roseberry that he did not read the note to plaintiff. Snow denied making such statement. The persons named testified that Snow did make such statement. Also, when Snow first testified he said nothing about having told plaintiff that he, too, was to sign the note. This important fact was not recalled until after the petition was amended to plead a material alteration. It is true that Snow was not specifically asked regarding this feature when he first testified, but he was repeatedly asked to detail all that was said regarding the note during the conversations with plaintiff prior and at the time he claims plaintiff signed. At no time did he mention that he was also to sign the note until he gave his deposition. Also Rhodes said nothing about there being any

understanding prior to the time of its execution that Snow was to sign the note. Plaintiff was practically blind, old and infirm. Snow was frequently at plaintiff's home to see her about the affairs of the company. When plaintiff signed the note she had nothing of consequence except the home she occupied. She knew that the undertaking company was involved, but did not know to what extent. It is unreasonable that plaintiff under the circumstances would knowingly sign the note, and we hold that Snow made no explanation to plaintiff at any time about the note and that she did not know what she signed. That it was, under the circumstances, Snow's duty to explain the note to plaintiff is not denied, and this he did not do as plaintiff testified and as we have found, hence plaintiff is not bound by her signature.

There was no evidence of any representations except by Snow who claims that he fully explained the note to plaintiff. We have found that he did not do so, hence we can only infer that Snow in some manner deceived plaintiff. Such conclusion is not unreasonable under the facts and circumstances obtaining.

Was the note so altered as to release plaintiff as against defendant? We proceed with this assignment as though all is regular, except the alleged alteration. Without further setting out the evidence we think that it is sufficient to say that Snow signed the note after he had delivered it to Rhodes who was acting for and received the note on behalf of defendant. If Snow, after delivery, signed the note as guarantor and not as maker then such signing would not, under the law, be a material alteration. [Bank of Moberly v. Meals et al., 316 Mo. 1158, l. c. 1166, 295 S. W. 73.] But it is not contended that Snow signed the note otherwise than as an original promisor or maker. Where a negotiable promissory note is materially altered without the assent of all parties thereon it is void, except as against a party who made, authorized or assented to the alteration and subsequent endorsers, and except as to a holder not a party to the alteration who may enforce according to the original tenor. [Sec. 910, R. S. 1919; Bank v. Helmbacher, 199 Mo. App. 173, 201 S. W. 383.] A material alteration of a negotiable promissory note is one which changes (1) the date; (2) the sum payable, either principal or interest; (3) the time or place of payment; (4) the number or relation of the parties; and (5) the medium of currency in which payment is to be made, or which adds a place of payment where no place of payment is specified, or any change or addition which alters the effect of the instrument in any respect. [Sec. 911, R. S. 1919.]

Independent of the statute the adding of an additional party to a negotiable instrument subsequent to its execution and delivery discharges the original parties when such change is made without their knowledge or consent. [Bank of Moberly v. Meals et al., supra, and cases there cited.] It is not of consequence as to whether the altera-

tion is beneficial or injurious to the party sought to be charged. In 1 Rul. Cas. Law, page 968, the law in this respect is stated thus: "It is unimportant whether the alteration was beneficial or injurious to the party whom it is sought to charge on the instrument. The question is not whether such party has been or could be injuriously affected, but whether or not his rights have been materially affected, whether the contract in its altered condition is the contract into which he entered. That is material which might become material, and any alteration which may in any event alter the rights, duties, or obligations of the person sought to be charged is material in the legal sense."

The above from Rul. Cas. Law was quoted with approval in Bank of Moberly v. Meals et al., supra. The facts of the cause at bar so far as concerns the question of alteration are somewhat similar to the facts on the same question in Bank of Moberly v. Meals et al., and on the authority of that case we rule that the addition of Snow's name under the circumstances was a material alteration and discharged plaintiff from liability on the note.

It is argued by defendant that the note was given merely to secure the account and for that reason the addition of Snow's name did not amount to a material operation. To support this contention learned counsel rely upon B. F. Avery & Sons Plow Company v. Farrar, 250 S. W. (Mo. App.) 926. In that case the notes mentioned were given, not to secure, but as mere evidence of an account and the suit was on the account and not on the notes. The alteration there was like the one here, an additional name was added after the execution and delivery of the note, and under the facts there we ruled, whether necessary or not, that the alteration was not of consequence.

Defendant complains of the exclusion of evidence as to the understanding that defendant was not to press collection on the note until after the death of plaintiff. The record shows that evidence to the same effect went in without objection and we have considered it all. The judgment should be affirmed and it is so ordered. *Cox, P. J.,* and *Bailey, J.,* concur.